**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

IN THE MATTER OF AGO,

        Petitioner,

v.                                **Case No. 8:09-cv-976-T-17TBM**

MICHAEL ODU,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral for a Report and Recommendation on **Petitioner's Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be Entered Against Respondent and Incorporated Memorandum of Law** (Doc. 3) and Respondent's **Motion to Dismiss for Lack of Subject Matter Jurisdiction** (Doc. 13).[1]

I.

This action was instituted by the filing of a Petition for return of minor child by the child's mother, Giovanna Gianesini ("Petitioner" or "mother"), pursuant to the Convention on the Civil Aspects of Child Abduction ("Hague Convention"), T.I.A.S. No. 11,670, and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.. (Doc.

---

[1]Additionally, the Petitioner filed a Motion *in Limine* to exclude the testimony of the minor, AGO (Doc. 19) to which the Respondent filed his memorandum in opposition (Doc. 20). For reasons set forth below, the motion is **denied.**

1).  Petitioner asserts that she and Respondent, Michael Odu ("Respondent" or "father"), are

the parents of the minor child, AGO ("AGO" or "child") who was born September 21, 1994,

in Daytona Beach, Florida.[2]  Petitioner, an Italian citizen, alleges that since 2001, AGO's

habitual residence has been with her in Vicenza, Italy.  She alleges that Respondent refused to

allow AGO to fly home to Italy on August 30, 2008, and that he has been wrongfully retained

by Respondent since that date.

In response, the father, an American citizen, residing in the Middle District of

Florida, filed a motion challenging the court's subject matter jurisdiction.  (Doc. 13).[3]

Additionally, he filed an Answer and Affirmative Defenses wherein he raises four defenses.

(Doc. 18).  He asserts that AGO was not wrongfully retained because the United States is his

habitual residence and moreover, the mother consented to his remaining in this country.

Alternatively, Respondent argues that AGO has reached an age of maturity and desires to

remain in the United States with his father.  Lastly, he argues that the child is settled and

acclimated in the United States, and the mother has unduly delayed in filing her Petition.

An evidentiary hearing was conducted June 29, 2009.  The parties testified as did the

child.[4]  Following the hearing, the parties submitted proposed findings and conclusions.  *See*

---

[2]At the hearing, the child was referred to as "Andre."

[3]By this motion to dismiss, Respondent essentially argues that because the child's
habitual residence is in the United States, the court is without jurisdiction.  However, the
motion (Doc. 13) is appropriately denied as the court has jurisdiction over the alleged
wrongful removal/retention claim pursuant to 42 U.S.C. § 11603 ("The courts of the States
and the United States district courts shall have concurrent original jurisdiction of actions
arising under the Convention.").

[4]Petitioner submitted a composite exhibit containing copies of matters purportedly
submitted to authorities under the Convention and an English translation of a September 29,

(Docs. 30-31).  In a nutshell, Petitioner claims that Italy is the habitual residence of AGO because he has attended school at least 70% of the time in Italy excluding the 2008-2009 school year when he was in school in Florida after being wrongfully retained.  In Italy are his brother and sister ("the twins") with whom he is close; friends, cousins, and grandparents; and an active life including sports activities such as basketball.  After completing middle school there, he was scheduled to start high school in Italy before he was wrongfully retained.  While the child regularly visited Respondent in Florida, his home is in Italy.  By her contention, the child was wrongfully detained by the father in Florida at the end of his summer visit in August 2008.

By her testimony, she and the Respondent lived together as husband and wife in the United States from 1993 to 2000 but were never lawfully married.  Their child, AGO, was born in Daytona Beach, Florida, in 1994.  While here, she earned a bachelors and a masters degree from the University of Central Florida.  In 2000, she moved back to Italy with AGO, who was six years old at the time, because her student visa had expired.  She is studying for her Ph.D. and is certified as a counselor in Italy.  In May 2001, she gave birth in Italy to AGO's siblings ("the twins").  They reside in Schio, a town near Vincenza, Italy.  She testified

---

2008 decree from an Italian court granting custody to Petitioner.  There appears no question that the matters submitted to the authorities in Italy and forwarded to the U.S. under the Convention are admissible under the Convention.  The English translation of the September 2008 decree was not part of those documents.  It was filed with the court June 26, 2009, but was subsequently stricken for Petitioner's failure to comply with the redaction requirements of Fed. R. Civ. P. 5.2(a).  It is resubmitted as part of Petitioner's Exhibit 4A.  No issue has been raised as to the authenticity or accuracy of the translation.  Notably, if the Italian court(s) entered additional orders on this matter thereafter, they have not been submitted for this court's consideration.

that between 2001 and 2006, she and the Respondent regularly agreed to a rotating custody arrangement without problems. She claims the agreed plan was for the children to spend three months during the summer with the Respondent in the United States and nine months with her in Italy. She testified that when AGO was older they followed this plan where he would spend the summer with the father. However, when questioned on cross examination, she could not be specific as to the actual dates and times that AGO lived with her in Italy versus living with the Respondent in Florida, and upon further questioning acknowledged that AGO may have in some years lived up to, but no more than, a total of six months out of the year in the United States.

From September 2007 through July 13, 2008, AGO lived continuously with his family in Italy and attended the 2007-2008 school year (his last year of middle school) in Italy. She agreed to send AGO to visit his father for summer vacation in July 2008, with the intention that he would start high school in Italy in the fall of 2008. She testified that AGO had chosen and enrolled, prior to leaving for Florida, in an Italian scientific high school for the 2008-2009 school year. She and Respondent agreed that when he finished the 2007-2008 school year, he would again travel to visit the Respondent and they agreed upon a return date in August 2008. An e-mail she received from the father indicated AGO would travel to Florida on July 13, 2008, and return to Italy August 29, 2008.[5] On each prior occasion that the

---

[5]The June 11, 2008 e-mail indicated that the Respondent had arranged for airline tickets for the children leaving Venice, Italy on July 13, 2008 with a return flight from Tampa, Florida on August 29, 2008. An e-mail a week later suggests that they were still addressing travel dates for the "vacation" and that the Respondent planned to fly to Italy so he could accompany the children back to Tampa. Pet'r Exh. 4A.

children visited with the father, the children had been returned to her. Thus, she testified that she had no reason to believe that AGO would not be returned per the arrangements set forth in the e-mail from Respondent.

She received an August 7, 2008, e-mail from Respondent which indicated that he intended to keep the children in Florida and had enrolled them in school. Ostensibly this was so he could arrange for the twins to obtain citizenship.[6] This decision was unilaterally made by the Respondent. Petitioner called Respondent to tell him the children should be returned to her. School in Florida started August 18, 2008. AGO was enrolled in the last year of middle school, and the twins were enrolled in first grade, one year behind where they would have been enrolled in Italy. She objected to the decision to enroll them in school in Florida. She states that she contacted the school to find out how her children could be enrolled without her permission. She also contacted the "Central Authority," an attorney, and pursued action under the Hague Convention. She claims that she contacted the U.S. State Department to ask for its assistance and that it sent Respondent a letter, but he still refused to return the children.

Petitioner came to Florida in September 2008. She claims her purpose for coming was to retrieve the children and bring them back to Italy although she acknowledged that she represented to the Respondent only that her purpose for her visit was just to see the children. While in Florida, she stayed at Respondent's home and accompanied the twins to their school. During her visit, she attempted to obtain the voluntary return of the children, and she and the

---

[6]The e-mail, dated August 7, 2008 is also part of Petitioner's Exh. 4A.

Respondent argued about this. The Respondent agreed to let her bring the twins back to Italy, but refused as to AGO. After approximately one week, she returned to Italy with the twins.

She claims she and AGO discussed his return during this visit and tried to get him to return home. Prior to this visit, he had evidenced his desire to return home in text messages to her and his friends indicating he missed them. She claims that although she tried multiple times to get Respondent to agree to return the minor child, she never specifically asked AGO to come back to Italy with her.

Petitioner claims she initiated custody proceedings in Italy before Respondent picked up the kids to travel that summer. She testified that she and the Respondent had previously discussed custody arrangements, and she had wanted him to sign a joint custody agreement for filing in the United States, but Respondent would not agree. She wanted to regulate all the traveling back and forth and she wanted child support. As noted above, she entered into evidence an English translation of a September 26, 2008, ex parte decree from the Juvenile Court in Venice-Mestre, Italy, which purports to grant her sole custody of AGO and the twins, financial support, with restricted rights of visitation in Italy for the father. (Pet'r Exh. 4A). She testified that a copy of this was sent to Respondent, but he has not abided by it.

In February 2009, Petitioner again traveled to Florida to retrieve AGO. Before the trip, she claims that she contacted the authorities in Italy and the United States, and she was advised that she could not take AGO back to Italy without the father's consent or it could be considered a re-abduction. She had only limited access to the child on this visit, but at some point she gave him his U.S. Passport and a plane ticket for his return with her to Italy. She

denies asking the child specifically to do so, but she did attempt to get the Respondent to agree to this and he refused. AGO did not return with her.

She adamantly denies ever consenting to allow the child to stay here after August 29, 2008.

By Petitioner's account, AGO is intelligent, performs well in school, and has received good grades. He has family and friends in Italy. She described him as of average maturity for a 14-year old.[7] She does not believe that AGO should have to choose where to stay.

On cross, Petitioner had difficulty remembering dates, but she conceded that the child rotated between living in Italy and the U.S. She admitted a meeting in 2007 between Respondent and her brother, Marco, an attorney in Italy. She denied that it was there decided that the child would be allowed to choose where he would attend high school. Her visit to Florida in September 2008 was prompted by her concern for the children. She went to school with the twins but not AGO. She insisted that while she did not ask AGO to return with her, she did ask the Respondent repeatedly. She claims she was warned by Central Authorities not to use force to recover AGO. She admitted a text message to AGO in November 2008 which stated ". . . You are done with me, you never treated me right and not even your brothers. You make your choice and we make ours. . . ." (Resp. Exh. 1). However, she denied sending other

_____

[7]Petitioner's counsel conceded that the mother was not contesting AGO's level of maturity as it relates to his testifying, but rather argues that because he has been living consistently with the father since July 13, 2008, and has had very limited contact with the mother since September 2008, that AGO has been subjected to influence or manipulation by Respondent and as such, any testimony by AGO is tainted and should not be accepted.

similar text messages to her son. When she returned in February 2009, she admitted she spent some time alone with AGO, but she reiterated that she did not ask him to return with her; she only asked Respondent.

The Respondent introduced evidence of school records from Hillsborough County for 2002 through 2009. (Resp. Exh. 2 ). These records are not disputed and reflect that AGO attended elementary school in Hillsborough County from August 7, 2002 through November 23, 2004; middle school in August through November 2005 and February through May 2007; and high school from August 2008 through May 2009. *Id.* In response to the court's question, Petitioner acknowledged that they want AGO to be bi-lingual, which is why he was sent to school here. The child is a good student, he gets excellent grades, he suffers no mental deficiencies. He is of average maturity. The meeting with her brother was about money-child support.

Mr. Odu testified that he has lived in Brandon, Florida since August 2002. He and Petitioner lived together as a couple from 1993 to 2002. In 2001, Petitioner moved to Italy for the birth of the twins and AGO stayed with Respondent in Florida. Respondent traveled to Italy for the birth of the twins in May 2001. Respondent and AGO returned to the U.S. so he could start second grade. In October 2001, he returned to Italy until he finished second grade in May 2002. From May to December 2002, AGO lived with Respondent in Florida. By his account, Respondent would travel each May to Italy for the twins' birthday, stay through Memorial weekend, and return with all the children to Florida. While the twins would typically stay only for the summer, AGO would spend up to half of the school year with him in Florida. Respondent testified that 2007 was different because in February 2007, he

received a message from Petitioner telling him to come get AGO because she was done with him. That year, AGO spent February through July in Florida. AGO got a dog and decided he did not want to go back to Italy. When Respondent traveled to Italy in May 2007 for the twins' birthday, AGO did not want to go and instead stayed in Florida with Respondent's brother. In the summer of 2007, Petitioner and Respondent vacationed together with their three children in the U.S. and then to Greece. Respondent testified that in August of that year, Petitioner would not let AGO return to the U.S. She wanted him to complete middle school in Italy. They argued over where AGO should go to school during 2007-2008. The Petitioner wanted AGO to finish his middle school year in Italy. Respondent testified that the child had struggled each year transitioning back into school in Italy under the existing arrangement, and he wanted AGO to go to school in Florida where he did well. Petitioner and Respondent agreed to meet with a third person to discuss the situation, and Petitioner's brother, an Italian lawyer, agreed to act as mediator. According to Respondent, it was agreed that AGO would attend the 2007-2008 school year in Italy, following which the child could then decide where he wanted to attend high school. Additionally, an agreement was reached regarding child support whereby Respondent would pay one thousand Euro per month to Petitioner. Respondent acknowledged that in the year immediately preceding AGO's trip to Florida in July 2008, AGO lived continuously in Italy, but that was as a result of the agreement reached at the meeting with Petitioner's brother. He testified that the agreement was communicated to AGO.

Shortly after coming to Florida in July 2008, AGO made the decision to stay in Florida and called his mother and grandmother to communicate that. While Respondent

would characterize AGO's habitual residence from 2002 to 2006 as "rotating," he urges that since 2007, the United States is AGO's habitual residence. Specifically, since February 2007, AGO considered Florida his home. After coming in the summer 2008, AGO belonged to the Brandon YMCA where he attends leadership meetings and plays basketball. AGO attends church and is involved in community activities, such as the Leukemia Walk, with his father. He is a member of the honor society and the math club. AGO is settled in the United States and has friendships that were in place before the summer of 2008. AGO now has two dogs in Florida and wants to become a veterinarian when he gets older.

Respondent testified that AGO had difficulty socially in Italy, was teased, and had problems adjusting to school. He claims that the eleven months AGO spent in Italy during the 2007-2008 school year were terrible; he was sick for several months and could not wait to return to Florida. When AGO returned to Florida in the summer of 2008, he was expecting to stay as he brought more of his personal belongings than he had in the past. He had a 3.9 grade point average for his freshman year (2008-2009) which he attended in Florida.

Respondent described AGO as suffering from a congenital condition (imperforated anus) which causes him some problems with his clothing, but he is otherwise fine socially. In Italy, he was teased about his condition. He is smart, analytical, logical, reasonable, and he has feelings. He is on the same maturity level as his peers. He has friends in the community.

Respondent testified that when Petitioner came to Florida in September 2008, she came to help the children transition to school. Flying her to Florida from Italy was a surprise birthday present for AGO. She spoke several times with AGO during her trip. Respondent claims he only wants to do what AGO wants in this matter. If AGO had indicated he wished

to return to Italy, Respondent would not have prevented this. AGO could have returned to Italy with her if he had wanted, but he chose to remain in Florida. By his account, Petitioner sought to go to a Ph.D. program here, but that did not work out.

When the mother returned to Florida in February 2009, she said that she wanted AGO to go back with her to Italy. He arranged to have AGO and his mother meet as often as he could. After one meeting, AGO was provided an airplane ticket to Italy and his U.S. passport.

He dates AGO's habitual residence in the U.S. to February 2007, when his mother said to come pick him up despite his returning to Italy for the 2007-2008 school year.

On cross-examination, he conceded that the agreement for AGO to be able to choose which school he would attend for high school was never reduced to writing. He also conceded that during the 2007-2008 school year, AGO did not visit in the U.S. He agreed that AGO had friends and family in Italy and he played sports in Italy, but he urges that it is not the same as in the U.S. He denies that AGO did as well in school in Italy. Respondent believes AGO transitioned better in school when he came to the U.S. Respondent was made aware of the custody proceedings in Italy, and he participated in writing but not in person. After AGO started to complain about his mother's text messages to him, Respondent has had his son speak English with his mother. He insists that he and Petitioner agreed that AGO would complete middle school in Italy and then AGO could choose where he would attend high school.

As noted above, Petitioner also filed a motion *in limine* to prohibit testimony from the minor child. (Doc. 29). At the hearing, the court conducted an informal hearing in

Chambers with AGO, counsel for both parties, and a court reporter. Based on the discussion with the minor child, the court was satisfied that AGO was capable of understanding the oath and evidenced the intellect and maturity to warrant consideration of his views. Petitioner argued only that the child has been subjected to undue influence by the father for nearly a year, and thus his testimony is tainted. In denying the motion, the court indicated it was necessary to consider the whole of his testimony before deciding the weight to be given to the same. Accordingly, the motion *in limine* was denied, and AGO was permitted to testify.

AGO testified that he has lived in Brandon, Florida for the past four years. He estimated that he spent approximately half of the year in Florida and half of the year in Italy during middle school. In 2007, he was in Florida more than half of the year, but was in Italy for the 2007-2008 school year. He testified that he was not present during the meeting in 2007, between his parents and his Uncle Marco, but that he spoke to them about it and based on the communications from his uncle, he was under the impression that he would be given a choice where he would attend high school. He testified that he has not heard his mother state that he would have that choice, but he believed she would let him choose. According to AGO, he made up his mind to stay in the U.S. even before he came here in July 2008. He did not tell his mother this, and in fact he told her he would return in order to get her to agree to let him come to the U.S. His father's neighborhood is nice; he has friends there; and there are places to play.

Since the Fall of 2008, AGO exchanged e-mails and text messages with his mother. The mother has accused him of betraying her and the twins' trust. He stopped calling her on the telephone approximately a month ago because she was not listening to him. He testified

that she has tried several times to convince him to come to Italy. He has told her that he wants to stay here. He described her visit in September 2008 as "tense." She did not understand why he wanted to stay here. He did not go back with the twins because he wanted to stay here. The visit in February 2009 was very "uncomfortable." She did not ask him to return, but they spoke about why he wanted to stay, the pros and cons of the U.S. and Italy. He concluded by telling her he wanted to stay in the U.S. His father has never asked him to stay, nor has his father told him he did not want AGO to return to Italy.

AGO testified that he is more comfortable here in the United States; has more space; and his mom does not understand him that well. He chose his words carefully in testifying that he is not choosing a parent, but rather he chooses to live in the United States over Italy.

On cross-examination, he said he never heard his mother say he would have a choice about where he would go to high school. This is what he heard his uncle say. When asked about the eleven months he was in Italy preceding the summer of 2008, he stated he attended school there and played basketball part of the time. He failed a class. He has cousins and family in Italy and testified that he misses them. He lived in the same house there for several years. For schooling purposes, he advanced year to year in Italy. It was not until September 2008, that AGO sent his mother a text message telling her that he wanted to stay in the United States. He had previously made the decision. At no time did he want to pick a parent, but he made the decision to stay in the U.S. He is aware of the custody decree in Italy. He has not gone home because he did not think he could return to the U.S. He misses the twins and his friends in Italy. Before coming in July 2008, he had signed up for school in Italy. Based on a

series of text messages from his mother, AGO believed that she eventually agreed with him staying in the U.S., and that this was over.

II.

A.

The Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670,[8] to which Italy and the United States are signatories, was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." The rationale underlying the Convention is that a child's country of habitual residence is the place where decisions relating to custody and access are best decided. *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002). The United States implemented the Convention through the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq*., which entitles a person whose child has been wrongfully removed to, or wrongfully retained in, the United States to petition a federal court to order the child returned.[9] 42 U.S.C. § 11603(b). Courts considering an ICARA petition have jurisdiction to decide the merits only of the wrongful removal or retention claim, not of any underlying

---

[8]The Convention is reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986).

[9]The United States ratified the Convention in November 1986 and, in November 1988, President Reagan issued a Proclamation that the Convention had entered into force for the United States on July 1, 1988, and that it must be observed and fulfilled in good faith by the United States and its citizens thereafter. ICARA was enacted during the same year to implement the Convention.

custody dispute.  *Lops v. Lops,* 140 F.3d 927, 936 (11th Cir. 1998); *see also Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir. 1996).

The Petitioner bears the initial burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A); *see also Ruiz v. Tenorio,* 392 F.3d 1247, 1251 (11th Cir. 2004).  To establish a case of wrongful removal or retention, the Petitioner must establish by the preponderance of the evidence that: (1) AGO was a "habitual resident" of Italy immediately before the date retained by the Respondent; (2) the retention was in breach of the Petitioner's custody rights under the law of Italy; (3) Petitioner had been actually exercising or would have been exercising custody rights concerning AGO at the time of AGO's retention; and (4) the child has not attained the age of 16.  *See* Convention, art. 3, T.I.A.S. No. 11,670 at 2; *Ruiz*, 392 F.3d at 1251; *Lops*, 140 F.3d at 936 (citing 42 U.S.C. § 11603).  If this burden is met, the child must be promptly returned unless Respondent can establish that one of the Convention's enumerated defenses applies.  *Lops,* 140 F.3d at 945.

### B.

The interpretation of "habitual residence" is important to the Convention because it will dictate the arbiter of the custody dispute.  However, neither the Convention nor ICARA actually define the term "habitual residence" and the courts have had some difficulty in doing so as well.  *Ruiz,* 392 F.3d at 1252.  Quoting the High Court of Justice in the United Kingdom, the *Ruiz* court stated "the notion [of habitual residence is] free from technical rules, . . . . The facts and circumstances of each case should continue to be assessed without resort to

presumptions . . . . All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Id.* Thus, in concept, a child's habitual residence depends on the intentions of the parties and their residence at a particular locale for a sufficient period of time to reveal a settled intent. In this circuit, the controlling intent is that of the parents rather than the child. *Ruiz*, at 1253.

*Ruiz* sets forth the analytical framework for determining a new habitual residence. "The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Ruiz*, 392 F.3d at 1252 (citing *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001)). "[W]hen an alleged abandonment of a clearly established habitual residence for a new home is at issue, the court must determine not only whether the child was settled in his new home, but whether the prior habitual residence was abandoned, and the new home has supplanted the old 'as the locus of the [child's] family and social development.'" *Small v. Clark,* No. 5:06-CV-125-OC10GRJ, 2006 WL 2024955, at *4 (M.D. Fla. July 17, 2006) (unpublished opinion) (quoting *Mozes,* 239 F.3d at 1084). "It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary." *Ruiz,* 392 F.3d at 1252 (citing *Mozes,* at 1075). The determination of this "subjective" settled intent is important "because there can be no bright line rule with respect to the length of an absence." *Id.* at 1253. "'All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'" *Id.* at 1252. However, settled intentions alone do not transform the habitual residence. "In addition there must be an actual change in geography and the passage

of a sufficient length of time for the child to have become acclimatized." *Ruiz,* at 1253 (citing

*Mozes,* 239 F.3d at 1078).[10]  In this circuit, it is the intentions of the parents (rather than the

child) which affect the length of time necessary for a child to become habitually resident.

*Ruiz* at 1254 (citing *Mozes,* at 1079-80).  When there is no shared settled intent on the part of

the parents to abandon the child's prior habitual residence, "a court should find a change in

habitual residence if the objective facts point unequivocally to a new habitual residence, or if

the court could 'say with confidence that the child's relative attachments to the two countries

have changed to the point where requiring a return to the original forum would now be

tantamount to taking the child out of the family and social environment in which its life has

developed.'" *Id.* (citing *Mozes*, at 1081).

C.

The determination by the court that a child was wrongfully retained "does not

automatically mean that the child must be returned to his or her habitual residence.  Rather,

once the petitioner has proven his or her case, "the burden shifts to the respondent to prove an

affirmative defense against the return of the child to the country of habitual residence." *Yang*,

499 at 271.  If a respondent proves one of the enumerated exceptions as an affirmative

defense, a district court has the discretion to refuse to order the child be returned to his

---

[10]Courts look to the following factors in determining whether a child is settled in a new environment: "(1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the [parent's] employment; and (6) whether the child has friends and relatives in the new area." *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1259 (M.D. Fla. 2008).

habitual residence.  *Id.* at 278.  Of the six exceptions under the Convention, two have application here:

> -- the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child; and
>
> -- the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

Hague Convention, art. 13, 42 U.S.C. § 11603(e)(2).[11]  However, in order to effect the purpose and intent of the Convention, courts shall construe and apply the exceptions narrowly.  *See Yang,* 499 F.3d at 278.

III.

As set forth above, to establish a case of wrongful removal or retention, the Petitioner must establish by the preponderance of the evidence that: (1) AGO was a "habitual resident" of Italy immediately before the date retained by the Respondent; (2) the retention was in breach of the Petitioner's custody rights under the law of Italy; (3) Petitioner had been

---

[11]Respondent also affirmatively states that "a sufficient amount of time has passed and AGO has acclimated to the United States" . . . and "AGO's mother delayed filing under the Hague Convention unduly." (Doc. 18 at 3).  There is an exception in the Hague Convention where the child is well-settled in the new environment but it requires a showing of a delay in filing judicial proceedings for more than one year from the wrongful removal or retention.  *See* Hague Convention, art. 12.  Here, judicial proceedings were instituted within one year of the wrongful removal or retention, thus the argument supports only the claim that the child's habitual residence was the U.S. at the time of the wrongful retention.

actually exercising or would have been exercising custody rights concerning AGO at the time of AGO's retention; and (4) the child has not attained the age of 16.

Although custody of the child has rotated between the mother in Italy and the father in the U.S. for much of the child's life, I am satisfied from a preponderance of the evidence, that the parties had the shared settled intention that the child's habitual residence be with his mother in Italy, at least through his completion of middle school in May 2008. Italy is where he did most of his schooling and while he undoubtedly had friends and relatives and other ties in both locales and his custody was rotated with some regularity over the years, the parties' descriptions of all this leave me believing that Italy is properly considered his habitual residence. This conclusion is not altered by the mother's cry for relief in February 2007, resulting in the father bringing the child here for the balance of that school year. While Respondent proposes that the child's habitual residence was in the U.S. at least since that date, the objective evidence is that he was returned to Italy thereafter for completion of middle school during the 2007-2008 school year.[12] Before leaving for the U.S. in July 2008, the child was enrolled in a scientific high school in Italy for the 2008-2009 school year. While claiming a different subjective intent, the child promised his mother he would return to Italy at the end of the summer.

------

[12]Respondent urges that the family traveled together during the summer in 2007 and while the child did return to school in Italy for the 2007-2008 school year, this was part of an agreement with Petitioner that after middle school, the child would have the choice of where to attend high school. This purported agreement is entirely disputed by Petitioner but even if there was such agreement, the habitual residence of the child at that time was Italy.

Respondent may properly claim that the child maintained continuous and close ties with him in Florida including living here for months at a time while attending school in Hillsborough County schools.  While here, it appears that he acclimated easily and well. Nonetheless, the greater concentration of his life and activities was in Italy.  It is apparent that the relationship between Petitioner and the child was strained to the breaking point in February 2007, but by the end of that summer, the child was again at his home in Italy.  There can be only one habitual residence in this context and despite Respondent's claims to the contrary, I find a shared intent by the parties that the child's primary and habitual residence be with his mother in Italy, at least through his completion of middle school in about May 2008.

After completion of middle school, as was fairly the routine, the parties made arrangements for the child and the twins to spend the summer of 2008 with Respondent. Correspondence referencing the travel arrangements suggest that the child's stay in the U.S. was temporary, intended to end August 29, 2008.  It is apparent that the child again quickly became acclimated to his surroundings, taking up activities in his Brandon, Florida neighborhood.  By the child's account, he already knew he did not want to return to Italy. Respondent claims that such reflects that the child was fully acclimatized to this new life by the end of the summer and thus an habitual resident, if not so earlier in time.  Both the Respondent and the child testified that by the end of August 2008, the child was fully settled on residing in Brandon and there attending high school. He urges that even if his habitual residence was Italy theretofore, by the end of August his new habitual residence was in the U.S.

As set forth above, the first step in acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Such an intention can be formed even during a stay originally intended to be temporary. However, in this circuit, the person(s) whose intent is relevant in this inquiry "'is that of the person or persons entitled to fix the place of the child's residence.'" *Ruiz,* 392 F.3d at 1253 (citing *Mozes* at 1076) (quoting from E.M. Clive, *The Concept of Habitual Residence,* 1997 Jurid. Rev. 137, 144).[13] Here, it is the parents who shared the child's custody. Clearly, Petitioner never intended that the child abandon his habitual residence in Italy for a new one in the U.S. While the child has convinced me that he developed a settled intent to remain in the U.S. at the end of the summer, his view is not controlling. In the given circumstances, the Respondent could not unilaterally act to change the habitual residence. Thus, I decline in the first instance to conclude that the habitual residence in Italy was abandoned by those entitled to fix the child's residence. While, there is demonstrated evidence that the child did well once he settled in to the home in Brandon in July, given that such positive contacts alone are not sufficient in this circuit to prove acclimatization and the court must look again to the parents' intentions in measuring the time necessary for a child to become habitually resident, I conclude there is insufficient showing that the child had become so acclimatized by the end of August 2008 that he was then habitually resident in the U.S. As the court in *Ruiz* stated, "' [d]espite the superficial appeal of focusing primarily on the child's contacts in the new country, . . . , we conclude that, in the

---

[13]In the foot note to this citation, the *Ruiz* court found unpersuasive a different approach adopted in the Sixth Circuit which rejected the use of parental intent as the standard and looked to the child's intent. *Ruiz*, 392 F.3d at 1253 n.3.

absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned.'" *Ruiz*, at 1253-54 (quoting *Mozes*, at 1079). As discussed below, while I conclude that the child sincerely wished to remain in the U.S. at least by August 2008, here I find the objective facts do not point unequivocally to a new habitual residence by the end of August 2008.

As for the remaining elements, it is undisputed that Respondent determined to keep all the children with him at the end of August 2008 without any prior discussions with the Petitioner. While there was no custody order in place at that time, such retention was nonetheless improper. The parties had evidenced a clear intent that custody of the child was joint, shifting back and forth by agreement or necessity. Here, the objective evidence indicates the parties' agreement was that custody would return to the mother at the end of August. In these circumstances, Petitioner could properly complain under the Convention when the children were not returned despite the lack of a formal custody order. *See Van Driessche v. Ohio-Esezeoboh,* 466 F.Supp.2d 828, 844-45 (S.D. Tex. 2006).[14] While I conclude that there had been discussions in the summer of 2007 about letting AGO choose which high school he would attend, such discussions were not reduced to a firm agreement

---

[14]Children who are wrongfully removed or retained prior to the entry of a custody order are protected under the Convention. *See* 51 Fed.Reg. § 10,505. Nor must parents in such circumstances first obtain a custody order in the State of the child's habitual residence as a prerequisite to invoking the Convention's return provisions. *Id.* at § 10,506. It appears that under Italian law, the Petitioner, in these circumstances, has primary authority over the child residing with her. *See* Pet'r Exh. 4A. Under U.S. law, both parents generally have equal custody rights to their children prior to the issuance of a court order allocating rights between them. Thus, Petitioner could seek relief under the Convention even in the absence of a prior custody decree.

such that Respondent can claim that the custody arrangement had been altered.  Here, the objective evidence reveals that the Petitioner expected the child to return in August 2008, to begin school and she was prepared to exercise her custody rights over the child at that time.  She was prevented from doing so when the Respondent failed to return the child as agreed.  Given the age of the child at that time, Petitioner has established each of the elements on her claim of wrongful retention.

Respondent raises two affirmative defenses which he urges are applicable.  First, he contends that the mother consented to AGO remaining in the United States and second he contends that AGO has reached an age of maturity that his objections to being returned should be heeded.

As set forth above, Article 13(a) of the Convention permits a court to refuse to order the return of children, despite a wrongful removal or retention, if Respondent proves by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention."  Hague Convention, art. 13(a).  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (citations omitted).  On this defense, Respondent suggests that a number of events demonstrate consent on the mother's part.[15]  In February 2007, the mother sent a message to the father saying that she was done with AGO and that the

---

[15]Although Respondent's Proposed Findings and Conclusions (Doc. 30) raise the defense of "consent," he argues the mother's conduct in 2007, as well as her conduct subsequent to the alleged wrongful retention, and thus the court addresses the argument as one based on consent and/or acquiescence.

father should come pick him up.  In response, Respondent traveled to Italy, bringing AGO back to the U.S. for completion of the 2006-2007 school year.  According to Respondent, following their travels together as a family in summer 2007, Petitioner and Respondent met with the Petitioner's brother, an Italian lawyer, to reach an agreement about certain matters regarding child support and AGO's schooling with the ultimate decision being that AGO would spend the 2007-2008 school year in Italy and that AGO would then decide at that point whether he wanted to attend high school in Italy or the United States.  Such is denied by the Petitioner, but I am satisfied that a meeting took place with the uncle in which this was discussed.  However, no firm agreement has been demonstrated such that the court can comfortably conclude from this that Petitioner consented in the summer of 2007 to allowing her child alone to determine where he would attend high school and thereby determine where he would reside after the 2007-2008 school year.

Respondent also urges that when Petitioner returned to Italy following her visit in September 2008, she left the country without AGO, but took his U.S. passport, thereby evidencing her acquiescence in his remaining in the U.S.[16]  Additionally, Respondent argues that a text message sent by the Petitioner to AGO in November 2008 stating " . . . you are done with me, you never treated me right and not even your brothers.  You make your choice, we will make ours. . ." demonstrates her acceptance of his decision to remain in the United States.  While Petitioner acknowledges sending the text, she adamantly denies consenting or

_____

[16]The child holds both a U.S. and an Italian passport and had traveled to the U.S. in July on his Italian passport.  The U.S. Passport was left with the child along with an airline ticket in February 2009.  I cannot conclude that the circumstances reflect consent or acquiescence.

acquiescing in AGO's remaining in the U.S. Further, she testified that she was in repeated contact with the authorities regarding obtaining his return, and she was actively pursuing custody in the Italian court system at the time, all of which point to a lack of consent or acquiescence on her part. The court agrees and finds that this sequence of events is also insufficient to demonstrate that Petitioner consented to or subsequently acquiesced in the child's retention, and thus that exception would not apply in the instant matter to prevent return of the child to Italy. This affirmative defense is not established.[17]

Finally, while Respondent firmly contends that the U.S. is and has been AGO's habitual residence, he nonetheless argues that even given a finding of Italy as the habitual residence at the time of the wrongful retention, the court has discretion to refuse to order the child to be returned to Italy where, as here, "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13; 42 U.S.C. § 11603(e)(2)(B). If proven by a preponderance of the evidence, this exception provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency. *Blondin v. Dubois,* 238 F.3d 153, 166 (2d Cir. 2001). However, like other exceptions, it is to be narrowly applied. *England,* 234 F.3d at 272.

The Hague Convention does not set a specific age at which a child is automatically considered to be sufficiently mature, and courts must make the determination on a case-by-case basis. *Yang*, 499 F.3d at 279. Professor Elisa Perez-Vera, the official Hague Convention

---

[17]On the other hand, this statement by the mother does reflect that AGO had firmly communicated to her his desire to stay in the U.S. with his father.

reporter, authored an explanatory report that is recognized as "the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494-01 at 10,503 (Mar. 26, 1986). Perez-Vera offers this insight into the child objection exception set forth in Article 13:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.

The Perez-Vera Report, *Actes et documents de la Quatorzieme Session, 6 au octobre 1980, Tome III, Enlevement d'enfants* at 433, ¶30, available at http://hcch.e-vision.nl/upload/expl28.pdf. Several courts have interpreted this language to acknowledge that "a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." *See de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007) (quoting *Blondin*, 238 F.3d at 166); *see also Leites v. Mendiburu*, No. 6:07-cv-2004-Orl-

19DAB, 2008 WL 114954, at *6 (M.D. Fla. Jan. 9, 2008) (court exercised its discretion in denying petition for return of a thirteen-year-old child who expressed affection for both parents and acknowledged missing family and friends in Argentina but nevertheless gave credible, independent reasons for her objection to being returned to Argentina and court found the minor to be bright, mature, and articulate in her reasoning); *Laguna v. Avila*, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *11 (E.D. N.Y. May 7, 2008) ( finding thirteen-year-old child's objection to being returned to Columbia to be the "product of independent reasoning and thoughtful consideration" and not the product of his parents' influence, and determining the child of an age and maturity that it was appropriate to take account of his views and "meets the narrow exception created by the Hague Convention's unnumbered defense to repatriation"); *McManus v. McManus*, 354 F. Supp. 2d 62, 71 (D. Mass. 2005) (court concluded that fourteen-year-olds' objections to being returned to Ireland were thoughtfully, and not reflexively, reached and ought to be honored).  Indeed, the "Convention clearly contemplates that the objections of a mature child should be taken account of and can be relied on to override the return that would otherwise be mandated." *Id.* at 72.

At the time of the hearing and the court's *in camera* interview of AGO, he was fourteen years old and due to turn fifteen in less than three months.  By his parents' account, he is intelligent and does well in school.  The court found him to be bright and more than adequately articulate, brief but thoughtful in his responses.  Neither Petitioner nor Respondent dispute that he possesses appropriate maturity for a person of his age, and the court found him to demonstrate a serious understanding of the proceedings and that which he was being called

upon to address.[18]  He understood the oath and was permitted to testify.  By his account, he

does not want to be returned to Italy and he wishes to remain in the U.S.  I credit his testimony

that even before coming to the U.S. in July 2008, he had determined he wished to stay here

despite what he told his mother.  He believes there was an agreement that would permit him to

choose where he would attend high school and by his choice he wishes to continue at Brandon

High School.  There is no reason presented to doubt the child's sincerity nor any doubt that he

honestly desires to stay in the U. S., while at the same time missing his family and friends in

Italy.  Other objective evidence supports this conclusion.  In September 2008 and in February

2009, AGO had time alone with his mother to discuss his reasons for wanting to live in the

U.S.  They often exchanged e-mails.  There is no credible evidence that the father sought to

interfere with the discussions or communications between the mother and child.  The child

accompanied his mother to the airport on both occasions when she left and could have

returned to Italy had he desired to do so.  He affirmatively chose to stay in the U.S. after

telling his mother why.  As noted above, the mother's frustrated text message to the child in

November 2008 also suggests that the child was firm in his conviction not to return to Italy.

The Court is unpersuaded by Petitioner's reliance on *Yang v. Tsui*, 499 F.3d 259 (3d

Cir. 2007) wherein that court found the minor child was not of sufficient age or maturity for

---

[18]As noted above, while not disputing his intelligence or maturity, Petitioner argues
that the passage of time and the father's undue influence prohibits the court from taking into
account the child's views.  Petitioner is correct that "[a] child's objection to being returned
may be accorded little if any weight if [for example] the court believes that the child's
preference is the product of the abductor parent's undue influence over the child."
Department of State, Hague International Child Abduction Convention, text and Legal
Analysis, Pub. Notice 957, 51 Fed. Reg. 10,494, 10,509 (1986).  I have carefully considered
this contention.

her views to be considered.[19]  Although ten years of age when interviewed by the court, the

child was only six years old when wrongfully detained and had been with the father only a few

weeks before the wrongful retention occurred.  Here, AGO had lived with his father in Florida

on multiple occasions prior to the summer 2008, at times up to six months out of a year.  He

had developed friendships and connections to Florida before returning in summer 2008.  He

had acquired a dog to which he was returning.  When he returned in July 2008, he brought

additional personal belongings, and it did not take him long to acclimate to his life in the U.S.

Thus, the court finds that AGO. has attained an age and degree of maturity at which it is

appropriate to take account of his views, and he has clearly expressed his desire to remain in

the United States and objects to his return to Italy.

Undue influence by the Respondent is not demonstrated.  While it would be naïve to

assume that the child has not been influenced in many ways by his positive relationship with

his father during the past year, and the sometimes uncomfortable relationship with his mother

brought on by the circumstances, it is not demonstrated that such affected his decision in

August 2008 that he remain in the U.S. for high school.

I conclude that the child's objections to returning to Italy are real and heartfelt.  As

he sees it, life is better here and he is more comfortable in his surroundings.  This is not a

choice of parents but as he sees it a choice of country.  Both parents appear loving and caring

---

[19]The court has also considered *In re Robinson*, 983 F. Supp. 1339 (D. Col. 1997) and
*Giampaolo v. Erneta*, 390 F. Supp. 2d 1269 (N.D. Ga.), relied upon by Petitioner, but finds
those cases involving ten-year-old children whose objections to return were either rejected or
discounted due to a finding of undue influence to be factually distinguishable from the instant
matter.

toward the child and both are capable of doing so. While the court does not condone the unilateral actions of the father in failing to assure the return of the child as agreed in August 2008, I do believe that such was equally the desire of the child that he not be returned. I am persuaded that the child's objection to being returned to Italy should be accepted and the Petitioner's request for relief be denied.

## IV.

Accordingly, it is recommended that Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 13) be **DENIED** and Petitioner's Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be Entered Against Respondent and Incorporated Memorandum of Law (Doc. 3) be **DENIED**.

**Recommended** in Tampa, Florida, this 10th day of July 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES of EXPEDITED RESPONSE TIME

Failure to file written objections to the proposed findings and recommendations contained in this report by **July 17, 2009** shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record